IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| HRP CREATIVE SERVICES CO., LLC | : | CIVIL ACTION |
| | : | |
| | : | |
| v. | : | |
| | : | |
| FPI-MB ENTERTAINMENT, LLC | : | NO. 09-290-STEWART DALZELL |

MEMORANDUM

Dalzell, J.[1]                                            May 22, 2009

This is a trademark and unfair competition case arising out of the failure of a theme park and its revival in a different form at the same venue.[2]  The licensing entity associated with the old theme park has filed a motion for preliminary injunction that would prevent the opening of the new theme park, set to open at 11:00 a.m. tomorrow, the beginning of the Memorial Day weekend and the commencement of the summer leisure season.

Under the circumstances, we convened an expedited hearing on May 20 at which we heard testimony and received exhibits and later reviewed declarations.  This Memorandum constitutes our findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52(a)(1) and (2).

## I.   FACTS

### A.   History

---

[1] Sitting by designation pursuant to 28 U.S.C. § 292(b).

[2] We have diversity and federal question jurisdiction.  The parties are citizens of Florida and Delaware, with principal places of business in Celebration, Florida and Myrtle Beach, South Carolina, respectively.  As will be seen, the amount in controversy far exceeds the diversity threshold.

From April through September of 2008, HRP Myrtle Beach
Operations, LLC ("HRP Myrtle") operated what it called the Hard
Rock Park, a $400 million theme park in Myrtle Beach, South
Carolina.  In those short months, fewer than 400,000 visitors
attended, not counting those visiting during a brief preview
period.  HRP Creative Services Co., LLC, ("HRP"), the plaintiff
here, allegedly designed the park.[3]

Steven Jon Goodwin was the CEO and CFO of now-defunct HRP
Myrtle, and Jon Binkowski was its Chief Creative Officer.  Both
of them were also owners and directors of HRP, and they each have
a long history in the entertainment and theme park business.  On
March 30, 2006, Goodwin signed a "Creative Services Agreement" on
behalf of both HRP and HRP Myrtle, in which HRP licensed its
intellectual property in the park to HRP Myrtle.  This coincided
with the funding for the park, which was finalized around this
time.

HRP filed this lawsuit to assert its alleged rights to the

---

[3] HRP is an entity separate from, and unrelated to, Hard
Rock Café International ("Hard Rock"), which apparently owns the
trademarks associated with the Hard Rock Café chain.  HRP used
Hard Rock's trademarks and other intellectual property pursuant
to a licensing agreement among HRP, HRP Myrtle, and Hard Rock.
Since defendant FPI purchased the park, it has removed Hard
Rock's intellectual property from the venue.  According to FPI's
testimony at the hearing, it has largely made its peace with Hard
Rock, confirmed as recently as this week during a walk-through of
the new park.  Apparently, relics of Hard Rock's identity -- such
as "Love All Serve All" signs -- remain, but will be imminently
removed.

intellectual property it claims at the park, which the new owner plans to open tomorrow.

### B.   **Bankruptcy and Sale of the Park**

On September 24, 2008, Hard Rock Park closed, and HRP Myrtle and some related entities (but not HRP)[4] filed for bankruptcy in Delaware under Chapter 11.  The bankruptcy converted to Chapter 7 on January 6, 2009, and on February 18, 2009 Bankruptcy Judge Kevin Carey entered an Order that authorized the sale of the park to defendant FPI-MB Entertainment, LLC ("FPI") for $25 million.

Under the terms of the Asset Purchase Agreement ("APA"), FPI bought, inter alia, "all goodwill and other intangible assets generated or associated with the Purchased Assets" and "all Inventory and Equipment," except that anything "branded with the Hard Rock Park, Hard Rock, or other similar logos licensed from a third party" was sold pursuant to compliance with the licensing agreements or the removal of the licensed materials.  APA, Def.'s Ex. E at 2.  Schedule 1.1(e) of the APA, entitled "Inventory and Equipment", lists fifteen rides that are located in the park. Ten of those rides are accompanied by the notation "excluding HRP Creative Services Co. LLC license."  This schedule also states that inventory and equipment excludes "all or any portions of such Inventory that is not transferable pursuant to any

---

[4] Colorfully, one of the related entities is called "We Got Your Back Security Co., LLC."

3

applicable license agreement restrictions."

### C.   The "Creative Content" Over Which HRP Asserts Ownership

In 2001, Binkowski began working on a concept for a new theme park, which was not music-themed.  He then contacted Goodwin about building a Hard Rock Hotel next to the theme park. Goodwin was well-suited for this task not only because of his theme park experience while with Hard Rock's then-owner, the Rank Organisation, but also because he had been an executive for Hard Rock.  By the summer of 2002 they had decided to design a theme park with a music theme.

According to Goodwin and James Pope, an architect who worked on the design of the park, the master plan and layout of the park, as well as the idea of a "rock 'n roll theme park," was complete before it became the "Hard Rock Park."[5]  Goodwin testified that he and his colleagues shopped the park idea to MGM, Six Flags, Paramount, and Hard Rock, among others, but finances did not appear on the horizon until Hard Rock agreed to participate.

According to Pope, "[t]he majority of the creative design and features [they] created for Hard Rock Park were based upon standard design features found in the theme park industry . . . .

---

[5] Before Hard Rock licensed its name and brand to the park, it was to be called the "Fantasy Harbour Theme Park." Pope Decl. at ¶ 3.

4

The only non-standard feature of the park was the Hard Rock brand and design elements related to the brand."  Pope Decl. at ¶ 10. See also Iain McGillivray[6] Decl. at ¶ 13 ("What made the park unique was the Hard Rock® brand and related design elements."). Goodwin would perhaps not be so concessionary, but in his testimony before us he did agree that theme parks share at least some common elements.  According to McGillivray, the park rides are "for the most part" standard and can be purchased for any theme park, and playing music with rides is also common. McGillivray Decl. at ¶ 12.  See also Fitzgerald testimony.

Goodwin testified that he and Binkowski worked for several years on the design of the park, and they assigned this work, which they call the "Creative Content," to HRP, a company they formed.  As noted above, Goodwin signed the Creative Services Agreement on behalf of both HRP and HRP Myrtle.  The "Creative Content" that HRP claims it owns is summarized in the "Creative Content Registry" ("CCR").  Some items in the CCR are generic and some are common to many theme parks, such as:

- Concept of Park *program* (mix of attractions and amenities) designed to allow all demographics and ages of a family unit to enjoy attractions in the same Zone (or "Land").

- Concept of landscaping to provide a significant portion of shade cover throughout pathways, plazas, gathering spaces, rest areas, tribute areas, displays, exhibits

---

[6] McGillivray did the feasibility study for the original park and worked on the rebranding of the park for FPI.

5

and some attractions

- **Theme Park Elements** (meaning the design and layout of the Park, the mix and all other aspects of the Attractions, the exterior and interior designs, layouts, concepts, themes, décor and other salient aspects of the Park and its elements, and the sales, marketing and promotional programs for the Park.)

- Buffeteria-style restaurant/food facility featuring indoor and outdoor seating, a live performance stage, island Theming and island/rock memorabilia.

Creative Content Register 2002-2006, Binkowski Decl. Ex. A

("CCR").

Some sections of the CCR are more specific; for example:

- <u>British Zone</u> area containing rides, shows, exhibits, displays, food and merchandise representing elements from England or any other past or present British colonies including Australia, Canada, India, various islands, etc. British Icons (i.e. Red Telephone Booths, Cobble Stone paths, Double Decker buses, etc.) will be included with British Influenced architecture, music, fashion, food and merchandise. (Note: some entrances/exits to this zone can be under a large Union Jack symbol or Flag.)

- Caribbean Island themed Crafts/Shopping area or carts and kiosks to include Hair wrapping and tattooing, craft making, musical instrument making/playing, apparel making, live entertainment and guest participation.

- Retail gift shop themed to look like an old retrofitted military Quonset hut, in a remote island paradise setting. The airbase-turned-biker-operated gift emporium is dressed in fighter squadron and motorcycle parts, art, logos, pin-ups and signage. Hammocks hold plush, military cases display goodies. There's almost a Swiss Family Robinson feel to how the proprietors used existing leftovers and natural materials to make their 'market'. Among the many merchandise offerings are flowered 'Hawaiian' wear like shirts, shorts and

bandanas (ala [sic] Tommy Bahama[7]), Zed [sic] Zeppelin, Queen, Elvis, Janis Joplin, Bob Marley and other 'legends of Rock' merchandise, coaster ride souvenirs, 'canteens' of water, sunglasses, etc.

- Full Service Sit-down Restaurant themed in a late 60's, early 70's antiwar, naturally 'bitchin' love-in decor. A converted church, this environment of ferns in crocheted baskets, peace signs, drip candles, incense, op-art, felt tapestries, folk art, fork [folk?] rock music and memorabilia has a House of Blues[8] feel with a hippie commune bent to it. . . .

- "Heckle House" (industry term for inanimate object or puppet that comically berates people in the crowd for fun entertainment purposes.) This Heckle device is a fiberglass cow that talks to the audience (via a live-voice performer off 'stage' on a speaker in the Cow's mouth), squirts 'milk' through it's [sic] udders, blows air and water out of its nostrils and 'udderly' [sic] harasses the crowd.

The CCR also includes references to a number of separate areas, such as the "British Rock Star Tribute Area," the "Double Decker Bus attraction," or a "British Car-themed Coaster."

Toward the end of the CCR, the document references future plans:

- Another Park Concept (i.e. Texas) -- Conceptual plan that takes into account accommodating day trippers and has the intended infrastructure planned to cater to business groups, conventions and large meetings . . . a new concept priority for theme park design

---

[7] There are 72 trademarks in the federal trademark database containing the words "Tommy Bahama."  Yet HRP -- staunch defender of intellectual property that it claims to be -- gives no attribution in the CCR, which HRP claims it owns.

[8] Again, the federal trademark database includes 86 entries for "House of Blues," but HRP does not provide any attribution in the CCR.

- Future Parks Concept -- Conceptual plan to roll-out Hard Rock Parks and/or Rock and Roll Theme Parks around the world.

HRP claims that it owns everything in the CCR, which includes elements of the theme park, broadly conceptualized zones, and descriptions of individual elements, such as retail stores. Also, HRP asserts it owns thirty-seven federally registered trademarks.

### D.   **The Post-Sale Dispute Between HRP and FPI**

On February 27, 2009, the CFO of FPI contacted Goodwin "to inquire about his intentions with regard to the CSA."  Def.'s Brief at 8. On March 1, 2009, Goodwin replied with a proposal that FPI license the intellectual property from HRP for, inter alia, a royalty fee of 1.5% of gross revenues or 1% of gross revenues with a $500,000 minimum annual license fee.  Def.'s's Ex. 1.

FPI did not respond to Goodwin's proposal and instead filed a motion in the Bankruptcy Court to enforce the sale agreement.[9] In that motion, FPI requested that Judge Carey hold that (1) HRP waived its rights to the intellectual property in the park because Goodwin was active in the bankruptcy proceedings (as CEO

---

[9] HRP hints that this was bad faith on FPI's part, but FPI said it had already discussed rebranding the park -- an option that Goodwin mentioned in his email but thought would be too costly to accomplish -- and decided to move ahead with that plan rather than negotiate a licensing agreement with HRP.

8

of the debtor) and did not object to the Order approving the
sale; (2) FPI owned HRP's rights (whatever they may be) in the
park; and (3) HRP would be enjoined from filing a lawsuit
regarding the intellectual property in the park.  In FPI's
motion, it argued that it purchased HRP's trademarks and trade
dress when it bought the park.  FPI also claimed that HRP only
owned its registered trademarks, which FPI could easily avoid by
not using those names, e.g., renaming the rides and restaurants
at the park.

Judge Carey noted that HRP "asserts correctly that the
creative content it asserts to be owned by it . . . [is] much
more than the license of just names."  Transcript of Telephonic
Hearing, March 30, 2009, Def.'s Ex. H, at 11 (emphasis added).
Judge Carey determined that the record was insufficient to grant
FPI's motion and denied it, but he was at pains to clarify that
"[n]othing in this decision should be taken as a determination of
the rights of either party."  Id. at 12.  Nonetheless, in its
brief HRP misstates Judge Carey's conclusion and alleges that
FPI's "simple re-naming of certain rides, while retaining the
highly distinctive and stylized themes and trade dress of those
attractions, is in direct conflict with Judge Carey's decision,
which . . . specifically states 'the creative content . . . -- is
much more than the license of just names.'"  Pl.'s Brief at 13.
HRP continues, "[u]nder Judge Carey's decision . . . HRP Creative

9

Services' intellectual property rights with respect to the Park encompass far more than the service marks and trademarks." Id. HRP reiterated these assertions at our hearing. In fact, Judge Carey made <u>no</u> such "decision" on the merits and explicitly stated so on the record.[10]

On April 9, 2009, counsel for FPI wrote to counsel for HRP to inform HRP that FPI planned to rebrand the park and would not be using HRP's registered trademarks in the new park. HRP responded with a letter demanding that FPI "cease and desist all use of any intellectual property belonging to HRP." Letter from Frank Ryan to Cherie Blackburn, April 22, 2009, Def.'s Ex. B. HRP claimed that its rights to the park "encompass far more than the service marks and trademarks" identified in the APA. <u>Id.</u> Two days later, FPI responded to the letter and stated that it planned to reopen the park without infringing on HRP's rights by extensively rebranding the park.[11]  FPI also asked what intellectual property, other than the registered trademarks, HRP thought it owned, but FPI claims to have received no response to this query.

### E.   <u>Procedural History -- This Case</u>

Instead, HRP filed this lawsuit on April 24, 2009, and then

---

[10] We call plaintiff's counsel's attention to Del. Lawyers' Rules of Prof'l Conduct R. 3.3.

[11] HRP claims that it did not receive this letter.

filed its motion for preliminary injunction a week later.  On May
13, FPI filed a motion to transfer venue to South Carolina, and
the next day HRP requested that we hold a hearing on its motion
before Memorial Day weekend.  In view of the urgency of the
preliminary injunction issue, we have deferred acting on the
transfer motion and convened the preliminary injunction hearing
at our earliest listing.

> **F.   FPI's Changes to the Park**

According to John Fitzgerald -- FPI's General Manager and
Executive Vice-President who is responsible for the "rebranding"
and operation of the new park -- since it purchased the park FPI
has spent over $3 million rebranding it as the "Freestyle Music
Park."  It was evident to Fitzgerald and the new owners that Hard
Rock Park had adult elements containing drug and sexual
references that FPI considered inappropriate for children and
families.  According to them, these drug and sexual elements were
not part of the Hard Rock brand but Goodwin and Binkowski added
them.

A glance at Def.'s Ex. 3 confirms the risqué and drug
elements the old park featured, which would offend many parents
around the country, and certainly, as Fitzgerald confirmed,
parents in the Carolinas.  One might summarize the changes FPI
made as going from Sgt. Pepper's "Lucy In The Sky With Diamonds"
to the "I Wanna Hold Your Hand" the Beatles sang on the Ed

11

Sullivan Show.   Thus, FPI:

- removed the hermaphroditic "Heckle Cow" with the squirting udders;

- covered a painting of a large marijuana leaf by the "Rock-n-Roll Heaven" section with a sunburst and changed the section to "Myrtle's Beach";

- removed the statues in the Heavy Metal Graveyard (including the headless pregnant woman with the protruding hand making the "rock on" symbol);

- removed the mural of the leering women over the urinals in the men's restroom;

- removed the photograph of the topless woman, her nipples covered by lollipops, from the "I Want Candy" store and changed it into a wine shop ("Red Red Wine");

- removed the advertisements for escort services and other sexual references from the red British telephone booth;

- removed the Zippo® lighter and sunglasses from the Statue of Liberty replica;

- changed the gay-themed Queen's Head Pub (with the "deliveries in rear" sign) to the Pitmedden Pub;

- changed the Carnaby Café (with women dressed in skimpy clothing dancing in go-go cages) to the Penny Lane Café (and removed the cages);
- changed the Punk Pit to a "fun, bright, children friendly area";

- removed drug references from the "Magic Mushroom ride" and covered it with butterflies and fairies;

- changed the drug-related "Nights In White Satin" ride (licensed through the Moody Blues) to the "Monstars [sic] of Rock" ride;

- removed Winston the mascot dog, Phonehenge,[12] and angel

---

[12] Imagine Stonehenge. Remake it with British telephone booths.

12

statues that were on their knees in high heels;

- changed Alice's Restaurant (licensed through Arlo Guthrie) to an employee cafeteria;

- renamed the restaurant formerly called "Great Meals" by day and "Eat Me"[13] at night to "Take 5 and Dine";

- converted the Heavy Metal Graveyard into a Rock Garden with large chia pets and other "kitschy" items such as large pet rocks; and

- changed all of the shows at the park.

See Fitzgerald testimony and Def.'s Ex. 3.

Moreover, FPI has, Fitzgerald reports, separate agreements with Gibson Guitars for the use of the guitar inlaid in the pavement, which is a "Les Paul Heritage Cherry Sunburst" guitar, and with London Transport for "The Underground" store.  It has changed the Led Zeppelin roller coaster to a Time Machine roller coaster and removed all Led Zeppelin references.  FPI is also negotiating a settlement with Mini Cooper because one of HRP's rides used cars that look like Mini Coopers, despite receiving a cease-and-desist letter from the car company.  FPI states that it will either reach a settlement or change the cars.

## II.  LEGAL ANALYSIS

In ruling on HRP's motion for a preliminary injunction, we

---

[13] Accomplished after dark by lighting only the neon tubes for the letters E, A and T and M and E of the daytime "Great Meals".

must consider[14] four factors: "(1) the likelihood that the moving party will succeed on the merits; (2) the extent to which the moving party will suffer irreparable harm without injunctive relief; (3) the extent to which the non-moving party will suffer irreparable harm if the injunction is issued; and (4) the public interest." Liberty Lincoln-Mercury, Inc. v. Ford Motor Co., 562 F.3d 553, 556 (3d Cir. 2009).  The moving party must show that it will suffer irreparable harm that is beyond monetary damages, and we must consider the extent, if any, to which it will suffer that harm. Id. at 557.  We will first discuss the straightforward second through fourth factors and then turn to the more complex merits issues.

###  A.   HRP'S Alleged Irreparable Harm

HRP asserts that it will suffer irreparable harm from FPI's use of its alleged intellectual property because it will lose control over FPI's use of it.  FPI has altered the park, and HRP claims the changes may hurt its reputation. The Creative Content, moreover, "is the sole asset of HRP Creative Services," and HRP

---

[14] Citing language from a 2007 decision of our Court of Appeals, defendant argues that HRP "must demonstrate that each of [these] factors favors the requested relief." McNeil Nutritionals, LLC v. Heartland Sweeteners, LLC,  511 F.3d 350, 356 (3d Cir. 2007) (emphasis added). But later jurisprudence, cited above, which in turn cites McNeil, simply states that we "must consider" these factors and does not indicate a shift away from the traditional balancing approach that courts take regarding these factors when ruling on a motion for a preliminary injunction. See Liberty Lincoln-Mercury, 562 F.3d at 556.

14

otherwise has "essentially nothing to market or sell."  Pl.'s
Brief at 22. HRP wants to "exploit[]" these elements in "further
ventures" and claims that it will be unable to do so if we deny
its motion. Pl.'s Brief at 23.

FPI responds that HRP has precious little reputation to
protect, given that its only asset is the Creative Content in a
park that failed after only five months of operation. HRP does
not have any concrete plans to use whatever intellectual property
it claims to have in the park.  Indeed, its plans to build more
theme parks with these elements at this point remain only a hope.
HRP's exploitation of its work to date has involved only early-
stage discussions with communities in Texas and California, and
HRP will not suffer any harm from competition with FPI and the
Freestyle Music Park in distant Myrtle Beach.  Goodwin also
admitted that HRP has no "physical outlet" for its alleged trade
dress.  FPI notes that HRP offered to enter into a licensing
agreement with FPI, which suggests that money damages would
suffice to compensate HRP.[15]

FPI concedes that "a strong showing of likely confusion has
also been accepted by many courts as proving irreparable harm,"
but (as discussed below) argues that HRP has not shown such
confusion here.  Def.'s Brief at 32.  HRP cites several cases

---

[15] HRP contends that if it had a licensing agreement with
FPI, it could exercise more control over FPI's use of its
intellectual property.

15

from our Court of Appeals in support of this proposition, but these cases address well-known trademarks, which are light-years from whatever intellectual property may be at issue here. See, e.g., Pappan Enterprises, Inc. v. Hardee's Food Systems, Inc., 143 F.3d 800, 802 (3d Cir. 1998) (holding that the district court should issue an injunction protecting the "Roy Rogers" restaurant name); Opticians Ass'n of America v. Independent Opticians of America, 920 F.2d 187, 198 (3d Cir. 1990) (directing the injunction of one opticians' group from using another's guild marks); Times Mirror Magazines, Inc. v. Las Vegas Sports News, L.L.C. 212 F.3d 157, 169-70 (3d Cir. 2000) (upholding an injunction protecting The Sporting News, a weekly magazine with a circulation of more than half a million).

FPI further claims that any associations that the park attendees (from Hard Rock Park's brief time of operation) might have made are with Hard Rock and the Hard Rock brand, not with HRP's amorphous non-Hard-Rock designs throughout the park. Finally, FPI notes that HRP must not have been in a big rush to protect itself because it "waited nineteen days after filing its Complaint to request an expedited hearing on the motion from the Court, knowing that the Park was scheduled to open Memorial Day weekend." Def.'s Brief at 34.

**B.   FPI's Irreparable Harm**

HRP contends that FPI will suffer no irreparable harm from

16

an injunction because any harm to FPI (e.g., delay in opening the park and costs to make further changes to it) can be remedied by money damages.  Furthermore, HRP contends, FPI knew that HRP believed that it owned the intellectual property at issue here and nonetheless proceeded to buy the park and make preparations to open it.  FPI, so the argument goes, caused any harm that an injunction would create and so FPI cannot claim that it will be irreparably harmed.  See Kos Pharmaceuticals, Inc. v. Andrx Corp., 369 F.3d 700, 728 (3d Cir. 2004).

In support of its claim that it will suffer irreparable harm if we grant plaintiff's motion, FPI complains that an injunction would delay the opening of the park past Memorial Day weekend, which inaugurates the summer holiday season, and perhaps keep it closed for all of the 107 days it expects to be open this year.  This, of course, could be remedied by damages -- assuming that HRP could pay them, a very big if since revenue losses could well exceed $300,000 per day --  but it would seem on this record that HRP has few assets and has engaged in nothing more than speculative prospecting of late.  Thus, FPI realistically could not expect to recover those prodigious losses.

The balance here is not close.  The harm to FPI would be catastrophic if we granted any injunction.  HRP's harm if we deny the injunction would be minimal at worst.

C.  **Public Interest**

17

HRP contends that because consumers will be confused by FPI's alleged infringement, FPI's use of HRP's Creative Content "'damages the public interest.'"  Pl.'s Brief at 26 (quoting S&R Corp. v. Jiffy Lube Int'l, Inc., 968 F.2d 371, 379 (3d Cir. 1992)).  But S&R Corp. actually holds that "[w]here a likelihood of confusion arises out of the concurrent use of a trademark, the infringer's use damages the public interest."  S & R Corp., 968 F.2d at 379 (emphasis added).  Because HRP's use of its alleged intellectual property is so limited now -- appearing, as it does, only on its Web site[16] and in general map layouts of speculative projects in Texas and California[17] -- it has no imminent or concrete plans in the works.  Thus, this portion of S&R Corp. does not apply to the situation at hand because there is now no "concurrent use" nor will there be any in the foreseeable future.

HRP also contends that "'if a plaintiff demonstrates both a likelihood of success on the merits and irreparable injury, it almost always will be the case that the public interest will favor the plaintiff.'"  Pl.'s Brief at 26 (quoting AT&T Co. v. Winback and Conserve Program, Inc., 42 F.3d 1421, 1427 n.8 (3d Cir. 1994)).  But this is not automatic.  We still must weigh all four factors.  AT&T, 42 F.3d at 1427 n.8.

FPI argues that the public interest weighs in its favor. If

---

[16] See Def.'s Ex. 2.

[17] See Pl.'s Ex. 7.

18

we grant the preliminary injunction, Fitzgerald credibly informed us that over a thousand employees would be out of work in a very weak labor market.  Inevitably, families planning to visit the new park this weekend will be frustrated if we forbid the park's opening tomorrow.

The public interest, too, tilts heavily in FPI's favor.

### D. <u>Likelihood of Success on the Merits</u>

In its complaint, HRP asserts the following claims:

- Count One: Trademark Infringement of various registered trademarks, under 15 U.S.C. § 1114(1)(A)

- Count Two: Trademark Infringement and Unfair Competition under 15 U.S.C. § 1125(a)

- Count Three: Violation of Del. Uniform Deceptive Trade Practice Act, Del. Code Ann. tit. 6, § 2531, <u>et seq.</u>

- Count Four: Common Law Unfair Competition and Infringement

In its motion for preliminary injunction, HRP claims that it will likely succeed on the merits of Counts One and Two, the Lanham Act claims.  HRP makes no mention of Counts Three or Four in its motion, and so we will not address those claims here.

### 1. <u>Trademark Infringement of Registered Trademarks under 15 U.S.C. § 1114(1)(a)</u>

The Lanham Act provides for civil penalties against "Any person who shall, without the consent of the registrant--(a) use

19

in commerce any reproduction, counterfeit, copy, or colorable
imitation of a registered mark in connection with the sale,
offering for sale, distribution, or advertising of any goods or
services on or in connection with which such use is likely to
cause confusion, or to cause mistake, or to deceive."  15 U.S.C.
§ 1114(1)(a).  HRP may establish trademark infringement under the
Lanham Act by establishing "that: (1) its mark is valid and
legally protectable; (2) it owns the mark; and (3) the
defendant's use of the mark to identify its goods or services is
likely to create confusion concerning the origin of those goods
or services."  <u>Commerce Nat. Ins. Services, Inc. v. Commerce Ins.</u>
<u>Agency, Inc.</u>, 214 F.3d 432, 437 (3d Cir. 2000).

FPI does not contest that the trademarks plaintiff lists in
its complaint are validly registered, but it claims that those
trademarks actually belonged to the debtor (and thus were
transferred to FPI when it bought the park) because HRP used the
debtor's funds to pay for the prosecution and protection of those
trademarks.  Even if the registered trademarks <u>do</u> belong to HRP,
however, FPI asserts that it is not infringing on them because it
has changed all of the registered trademarks in the park (<u>e.g.</u>,
renaming rides and restaurants) and does not plan to use the
registered trademarks in the future.  If this is correct -- and
HRP proffered no evidence to show otherwise -- then HRP has no

claim against FPI under § 1114(1)(a).[18]

### 2.   Trademark Infringement and Unfair Competition Under 15 U.S.C. § 1125(a)

HRP also claims that FPI has violated Section 43(a) of the Lanham Act by engaging in trademark infringement and unfair competition. That section provides that:

> Any person who, on or in connection with any goods or services . . . uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--
>
> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, . . .
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a).

Setting aside the issue of registered trademarks, HRP seems now to stress its right to trade dress, which is the "design or packaging of a product [that] may acquire a distinctiveness which serves to identify the product with its manufacturer or source." Traffix Devices v. Marketing Displays, 532 U.S. 23, 28 (2001).

---

[18] Notably, the only use HRP identified at the hearing appears on Career Builder's Web site, www.careerbuilder.com, and not on FPI's Web site.

To establish that the law protects its trade dress at the park, HRP must show that "(1) the allegedly infringing design is non-functional; (2) the design is inherently distinctive or has acquired secondary meaning; and (3) consumers are likely to confuse the source of the plaintiff's product with that of the defendant's product."  McNeil, 511 F.3d at 357.

Although in its brief HRP gave short shrift to its trade dress claims, at the hearing it was chanted as a mantra in Goodwin's testimony.  HRP asserts that it retains ownership in the Creative Content, as detailed in the CCR, and that Judge Carey determined "that the Creative Content was not transferred to FPI-MB and is retained by HRP Creative Services."  Pl.'s Brief at 18.  According to HRP, it "has shown validity and ownership of its intellectual property" and the only other issue is likelihood of confusion.  Id. at 19.  This conclusory argument ignores two of the three factors HRP must establish to succeed on its trade dress claim.

###           a.   **Non-functional**

Trade dress is protectable under 15 U.S.C. § 1125(a)(1)(A), but only if it is not "functional."  Traffix, 532 U.S. at 29; 15 U.S.C. § 1125(a)(3).  Trade dress is "functional," inter alia, when "it is essential to the use or purpose of the device or when it affects the cost or quality of the device."  Id. at 33.  FPI contends that some of the portions of the Creative Content are

22

functional and cannot be protected, for example the overall design and layout of the park.  FPI argues that the layout is standard among theme parks, and was based on a feasibility study, rather than on HRP's creativity.

### b.   <u>Inherent Distinctiveness or Secondary Meaning</u>

Trade dress must be "distinctive" in one of two ways: (1) "inherently distinctive" because its "intrinsic nature serves to identify a particular source"; or (2) it "has developed secondary meaning, which occurs when, in the minds of the public, the primary significance of a [mark] is to identify the source of the product rather than the product itself." <u>Wal-Mart Stores, Inc. v. Samara Bros., Inc.</u>, 529 U.S. 205, 210-11 (2000) (internal quotations omitted).  Product design is not inherently distinctive and, thus, may only be protected when it has gained secondary meaning.  <u>Id.</u> at 212.

HRP did not argue in its brief that the trade dress is inherently distinctive or has gained secondary meaning, and HRP failed to establish either of these factors at the hearing.  FPI contends that Hard Rock Park visitors would have connected any inherently distinctive features with the Hard Rock brand, <u>not</u> with HRP and its design of non-Hard Rock park elements.  Pope claims, and McGillivray confirms, that "the only thing unique about the Park was the Hard Rock® brand."  Def.'s Brief at 22. On this record this would be a fair conclusion.

Regarding secondary meaning, FPI argues that Hard Rock Park was not open long enough, nor did it have enough visitors, for any trade dress to gain secondary meaning.  This, too, on this record is persuasive.

Indeed, at the end of the day it is very hard to get one's hands around what, exactly, HRP claims is protectable intellectual property.  For example, in his testimony Goodwin objected on HRP's behalf to FPI's retention of the bond of the brickwork for what was "Maximum RPM" and now is FPI's "Round About" ride.  But as Goodwin acknowledged, this building and its brickwork explicitly mimic Sir Giles Gilbert Scott's famous Battersea Power Station on the south bank of the River Thames.  HRP's contention then must be that its <u>copy</u> of Sir Giles's "Temple of Power" is itself worthy of the law's protection.[19]  Such an extravagant claim finds no support we know of.

And Goodwin's claim on Sir Giles's handiwork was no isolated or throwaway assertion from the witness stand.  Without evident embarrassment, he staked a claim of ownership on an exact replica of the Statue of Liberty[20], never mind that Frederic-Auguste Bartoldi designed, and Alexandre Gustave Eiffel built, the

---

[19] Coincidentally enough, according to the Battersea Power Station Community Group's Web site, Sir Giles also designed "the classic red telephone box" seen in the Myrtle Beach park.  <u>See</u> <u>http://www.battersea-powerstation.org.uk/histl.html</u> (last visited May 21, 2009).

[20] <u>Sans</u> Zippo® lighter, sunglasses and Neil Jordan quotation.

Bedloe's Island original of <u>Liberty Enlightening the World</u>.
Goodwin also asserted intellectual property rights in
reproductions of houses in the Georgian style, never mind that
such architecture constitutes the artistic legacy of Sir John
Soanes and two generations of Eighteenth Century British
architects.[21]

Similarly, Goodwin expressed chagrin at FPI's retention of
the font on what was "The Queen's Head Pub" and is now FPI's
"Pitmedden Pub".  To be sure, both use Old English font forms,
but that font is seen on pubs throughout the United Kingdom -- as
Goodwin well knows[22] -- and could not conceivably constitute
anyone's intellectual property.[23]

In short, HRP's claim of "ownership" in its copies of
others' work is preposterous.

    c.   **<u>Likelihood of Confusion</u>**

There is a likelihood of confusion "when consumers viewing
the defendant's trade dress probably would assume that the

---

[21] These are only three examples of the extravagant claims
Goodwin made for HRP from the witness stand.  Thus, we will not
belabor his assertion of creative rights to a carousel because it
has . . . horses on it . . . and they are painted!  He also seeks
to appropriate Edwardian as well as Georgian architecture, as
well as flowers from the English countryside, etc., etc.

[22] Goodwin is from the United Kingdom.

[23] Fairness obliges us to note that Goodwin did not go so far
as to seek excision of the word <u>Pub</u> from FPI's Myrtle Beach
lexicon.

product it represents is associated with the source of a
different product identified by the plaintiff's similar trade
dress." McNeil, 511 F.3d at 357.  FPI argues that there is no
likelihood of confusion here.  It first notes that it is not
using any of the registered trademarks at the park.  Second, FPI
stresses that HRP is not, in any material way, now using any of
the intellectual property at issue -- and whatever use it makes
in no way involves the public -- so there is nothing for the
public to confuse with the park in its current state.

     FPI also discusses the factors that our Court of Appeals set
in Interpace Corp. v. Lapp, Inc., 721 F.2d 460 (1983), cited in
McNeil, 511 F.3d at 358.[24]  These factors are:

> (1) the degree of similarity between the
> owner's mark and the alleged infringing mark;
> (2) the strength of the owner's mark; (3) the
> price of the goods and other factors
> indicative of the care and attention expected
> of consumers when making a purchase; (4) the
> length of time the defendant has used the
> mark without evidence of actual confusion
> arising; (5) the intent of the defendant in
> adopting the mark; (6) the evidence of actual
> confusion; (7) whether the goods, though not
> competing, are marketed through the same
> channels of trade and advertised through the
> same media; (8) the extent to which the
> targets of the parties' sales efforts are the
> same; (9) the relationship of the goods in
> the minds of consumers because of the
> similarity of function; (10) other facts
> suggesting that the consuming public might
> expect the prior owner to manufacture a

---

[24] Notably, HRP does not cite what has become known as the
"Lapp test" in its brief.

26

> product in the defendant's market, or that he
> is likely to expand into that market.

Lapp, 721 F.2d at 463.

FPI argues that the third, seventh, and ninth factors do not apply here because they are directed at goods, rather than services.  We agree.  Regarding the other factors, FPI persuasively contends that:

1.   It has made significant changes to the park, so the degree of similarity is not as high as it might seem (that is, the park as it exists today is far from identical to the park the defendants purchased);

2.   As discussed above, HRP's claim to the trade dress (and other amorphously defined intellectual property) is not strong, especially since the public likely would have identified the park with Hard Rock, not HRP;

3.   [Not applicable];

4.   HRP is not currently using the trade dress in any public way, and thus there is to date no actual confusion;

5.   FPI did not intend to copy or use any trade dress. Rather, after posing an initial query to HRP about a licensing agreement, FPI decided to rebrand and repackage the park;

6.   Again, there is no actual confusion because HRP is not currently using the trade dress, and FPI believes there will be no confusion once the park opens because the public associated the park with Hard Rock, not HRP[25];

7.   [Not applicable];

8.   HRP's plans to license its intellectual property to other theme parks are inchoate and distant (involving venues in Texas and California), so HRP and FPI are not targeting the same audience;

---

[25] Goodwin also admitted that HRP has no current licensing agreements for the purported trade dress.

9.    [Not applicable];

10.   Again, HRP does not plan to have any future involvement
      in theme parks remotely near Myrtle Beach, so there is
      no indication that they are now, or will in the future,
      likely be in the same market.

On this record, we find there is no likelihood of confusion.

### d.   <u>A Note About Dilution</u>

In its brief, HRP has not specifically argued that its trade dress will be diluted (under the Lanham Act) by FPI's use.  Even if plaintiff had, FPI claims that HRP would not be successful on this claim because federal trademark law only protects non-functional trade dress that is "famous."  15 U.S.C. § 1125(c)(1), § 1125 (c)(4).  A mark is famous "if it is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner."  15 U.S.C. § 1125(c)(2)(A).

Here it borders on the laughable to think that HRP's trade dress -- whatever it may be -- is "famous".  This is so not merely because of the few months that Hard Rock Park was open and the paltry number of visitors it tried to entertain.  It is especially so because on Goodwin's account HRP's alleged trade dress claims are largely founded on a collection of copies of other people's creativity.

## III. CONCLUSION

28

HRP has failed to demonstrate that it will suffer harm.  By contrast, FPI's harm from a preliminary injunction would be catastrophic and probably fatal to the new park.  Given the low to non-existent likelihood of public confusion, especially weighed against the indefinite layoffs of more than one thousand people in this difficult economy, the public interest heavily weights in favor of FPI.  Given its vaporous to preposterous claims, HRP has not shown any serious likelihood of success on the merits.

We therefore will deny HRP's motion.

BY THE COURT:

_\s\Stewart Dalzell